WATKINS v. DELAHUNTY.

(Supreme Court, Special Term, Kings County. February 10, 1908.)

CONTRACTS—TERMS—EVIDENCE.

Evidence in an action to recover a share of the losses on the purchase, rehabilitation, and sale of a railroad *held* insufficient to authorize a finding that the contract between the parties was, or at least remained, as contended by plaintiff.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, §§ 1819, 1820.]

Action by Thomas C. Watkins against John Delahunty. Judgment for defendant.

Robert B. Honeyman, for plaintiff.

Choate, Hanford & Larocque (Edmund L. Mooney, of counsel), for defendant.

CRANE, J. The Lebanon Springs Railroad extended from Chatham, in Columbia county, of the state of New York, through Rensselaer county, to Burlington, Vt. It was about 65 miles in length, and at the times herein mentioned the greater part of it had been condemned by the Railroad Commission; 11 miles only being in operation. The company was in the hands of a receiver and about to be sold under order of the court; there also being outstanding against it labor claims and other evidences of indebtedness. In July or August of 1898 William C. Roberts, ex-president of the New York Standard Watch Company, Charles D. Haines, a Congressman, and John Delahunty, a lawyer, entered the field as railroad speculators or manipulators, purposing to buy jointly all the outstanding claims and liens against the Lebanon Springs Railroad Company. There is a dispute as to whether the original agreement between these parties was oral or in writing; but it is sufficient for this case that a subsequent agreement, made November 18, 1898, contains in substance a statement of the first contract made. I here set it forth at length, as it is virtually the basis of this action:

"Agreement made this 18th day of November, eighteen hundred and ninety-eight, between William C. Roberts, of the city of New York, party of the first part, Charles D. Haines, of the village of Kinderhook, Columbia county, New York, of the second part, and John Delahunty, of the city of New York, of the third part.

"Whereas, the said parties have agreed to purchase certain tax titles to the property of the Lebanon Springs Railroad, in Rensselaer county, New York, and certain receivers' certificates, issued by receivers appointed by the Supreme Court, in the action of the Hilton Bridge Company against said railroad and others, and in other actions, and certain other obligations of such receivers

for labor and material, and other claims against said Lebanon Springs Railroad, or the receivers thereof, existing or which may hereafter exist against said railroad, and against said receivers, in the counties of Columbia and Rensselaer, in this state, and in the state of Vermont, each of said parties to contribute equally to the funds necessary to make such purchases, and bear equally any losses that may arise in consequence thereof; and

"Whereas, the party of the second part is unable to contribute his pro rata share to the funds necessary for said purchase:

"Now, therefore, it is agreed between said parties, that the party of the first part shall provide the money which is now necessary on the part of the party of the second part to contribute for his share of such funds, and that on the sale of the properties thus purchased the losses shall be borne by and the profits divided between said parties as follows: Three-sixths thereof to the party of the first part, one-sixth thereof to the party of the second part, and two-sixths thereof to the party of the third part. All of the deeds and transfers of said property on said purchases shall be taken in the name of the party of the first part individually; but it is agreed that the same are held in trust, subject to the terms of this agreement. Before a division of the profits, each party shall be reimbursed the full amount which he has contributed to the enterprise.

"In witness whereof, the parties hereto have hereunto set their hands and seals the day and year first above written.

                         "William C. Roberts.    [L. S.]
                         "Charles D. Haines.    [L. S.]
                         "John Delahunty.      [L. S.]

"In presence of Santiago T. Cahill."

This agreement was drawn by the defendant, Mr. John Delahunty, who, being a lawyer of wide reputation and known ability, must be assumed to have understood the legal effect of the words: "Each of said parties to contribute equally to the funds necessary to make such purchases, and bear equally any losses that may arise in consequence thereof"—and the meaning of the other clause: "That on the sale of the properties thus purchased the losses shall be borne by and the profits divided between said parties as follows." Prior to this written agreement, which I have set forth, certain letters were written by Roberts to Delahunty which throw more light on the intention of the parties. One, dated July 30, 1898, acknowledges the receipt of Lebanon Springs Railroad papers from Mr. Delahunty's office, and continues as follows:

"At this stage it seems to be of little moment what is in the papers, further than to adopt Haines' information that the road will be sold under judgment of the Hilton Bridge Company and others similarly situated; that receivers' certificates, taxes, etc., aggregate about $120,000, at which sum he expects the property to be knocked down under the hammer; that we must be prepared to meet the condition of the sale. If some one else outbids and goes beyond our limit, we have simply lost our cherished hope for a good thing; that whatever money we put up for receivers' certificates, taxes, etc., will be repaid, and we have only lost our time and trouble. Now, the paper which Haines was so solicitous about, and so anxious to know if it was all right, so that he could go out and get subscriptions thereto—agreement or plan, formulated and adopted, to organize a company under the New York & Vermont Railroad Company —is about as appropriate for our purposes as would be a petition to probate a will. * * * It seems to me the sensible course for us to pursue is to get options on these receivers' certificates, tax warrants, etc., when we can, and, when that is impossible, to buy them outright, until we can get all that are out substantially under our control. Then, on the sale of the road, we can buy it, and for the moment we will own it as three individuals. Then we can immediately form a company, issue as small amount of bonds as possible to cover purchase, necessary improvements to put it in good physical condition, and a

little profit, so it will not have a heavy interest burden; and so it will be a success as a dividend payer upon the stock. In this way we could own and control the road."

Another, dated August 18, 1898, informs Mr. Delahunty that Haines and Roberts have been over the railroad property and describes it in part in these words:

"The road and equipment is in a dilapitated condition; but the foundation is there, and a good one, and it can be rehabilitated at a very reasonable expense."

The road's connections with other lines and its availability are mentioned at some length in this letter, together with a statement of the securities which Haines and Roberts are negotiating for, and a request for money in these words:

"I shall have to get a little of your help in the latter. * * * Haines told me he had sent to you for some money or a check. It is a great opportunity and can be made a splendid property. To me it looks too good to be true. It will probably result in our getting our money back after the sale, with a few thousand dollars profit."

Another, dated June 16, 1899, thus informs Mr. Delahunty:

"The rails on almost the entire road are in good condition. What it wants is new ties, and $100,000 will give us a road as good as could be desired. * * * An offer now at $200,000 would be no temptation."

On August 17, 1899, the road was sold at public sale and bid in by Mr. Delahunty for himself and his associates at $100,025, whereupon he gave to Mr. Roberts, who put up the required deposit, the following declaration:

"This is to certify that I, John Delahunty, the purchaser on the sale this day of the Lebanon Springs Railroad by E. W. Rieck, referee, purchased same as trustee for Messrs. Wm. C. Roberts, Charles D. Haines, and myself, pursuant to an understanding and a certain agreement between us, heretofore made, with reference to said railroad, and that the whole of the 10 per cent. of the purchase price on said sale paid by me, viz., the sum of $10,002.50, was advanced by Mr. Roberts personally.
"Dated Albany, August 17, 1899.

　　　　　　　　　　　　　　　　　　　　　　"Jno. Delahunty."

It must have been known to these parties that individuals could not own and operate in New York state a steam railroad, and that it would be necessary, in order to hold the property and franchises thus purchased and to run the road, that a corporation should be formed and the purchase turned over to it. Individuals could legally transfer a railroad in this way. Parker v. Elmira, C. & N. R. R. Co., 165 N. Y. 274–281, 59 N. E. 81. Evidently recognizing the necessity for incorporation, Mr. Delahunty immediately proceeded to prepare the necessary incorporation papers and to comply with the laws of the state of New York for the formation of a railroad company. On September 21, 1899, the Chatham & Lebanon Valley Railroad Company was thus brought into being, to which was transferred all property and rights purchased as above set forth. Up to this time, or about October of 1899, Roberts had expended in this venture about $105,800 and Delahunty had contributed about $7,800 and some expenses. It seems that after this railroad company had been organized and had received the

property purchased under the tri-party agreement of August and November, 1898, action was brought against Haines by Roberts and Delahunty to cancel his interests, which was settled by an agreement, dated November 29, 1899, drawn by Mr. Delahunty, wherein the previous agreements are referred to, and whereby Haines' interest is bought out for $3,000 of Roberts' money. It is conceded that thereupon Roberts' interests became three-fifths and Delahunty's two-fifths in this railroad enterprise or purchase, and that they were to share in that proportion the profits or the loss and to put up in that proportion the expenses.

After the formation of the Chatham & Lebanon Valley Railroad, and between December of 1899 and July of 1900, $800,000 of the stock of the company, it being capitalized for $1,000,000, was issued to Mr. Roberts and $300,000 to Mr. Delahunty, while of the $350,000 bonds, secured by trust mortgage, $250,000 of these appear to have come into the possession of Mr. Roberts and $10,000 or more into the possession of Mr. Delahunty. Other individuals held a few of these bonds, either through purchase or as securities for loans made the company. This railroad was under operation over a part of its system, but was not able to pay for itself and needed money, not only to carry on its business, but also to put it in condition to run over its entire line. ·Mr. Roberts was elected president of the company, and Mr. Delahunty vice president, director, and counsel. Between 1899 and July of 1901 Mr. Roberts put additional money into the railroad for ties, rails, lumber, locomotives, cars, pay rolls, etc., amounting to about .$175,000, over and above the amount he had spent in the purchase of the Lebanon Springs Railroad. In July of 1901 the Chatham & Lebanon Valley Railroad was sold to Mr. Webb for $250,000, $25,000 of which was not then paid, but retained till Mr. Roberts· made good his contract to deliver good and clear title; final settlement being made in 1906. All transactions regarding the sale to Mr. Webb appear to have been carried on with Mr. Roberts individually, and the contracts made with him. Thereafter, and in 1906, Mr. Roberts had accountants go over his matters and financial dealings in this railroad transaction from its inception in 1898 to July, 1901, with the result that a loss of some $40,-000 or thereabouts was shown. A demand was then made upon Mr. Delahunty in writing to pay his one-third (not two-fifths, as now claimed) share of this loss pursuant to the above-quoted contract, which being refused, the amount is sought to be recovered in this action; Roberts having assigned his claim to the plaintiff. To this deficit or loss of $40,000 is added in this action interest upon all the advances made by Mr. Roberts from the time of payment, which makes the total amount about $80,000, of which the plaintiff claims two-fifths from Mr. Delahunty.

The contention between the parties to this action is this: The plaintiff claims that the contract between Roberts, Haines, and Delahunty was to purchase the Lebanon Springs Railroad, form a corporation to hold and operate the purchase, rehabilitate it by the expenditure of money, and then sell it, or the stock and bonds which represented it, and share the profit or the loss, and that there was no time between

1898 and 1906 when the loss could be or was finally determined. Under this contention the plaintiff claims from Mr. Delahunty two-fifths of all the money Roberts spent, with interest, over and above what he received from Webb and from the defendant. On the other hand, the defendant contends that, while the contract and understanding between these parties was to purchase the Lebanon Springs Railroad, it was never contemplated or agreed that the parties individually should spend money to maintain and rehabilitate it, and that when the Chatham & Lebanon Valley Railroad was formed, and the bonds and stock issued in the proportions above stated, the contractual relations were ended, and that either the purposes of the contract had been consummated, or else so modified by the action and attitude of the parties as to relieve Mr. Delahunty from liability for Mr. Roberts' advances to the road, or, in other words, that Mr. Roberts took the bonds which represented the property as security or in payment for his advances, and divided the stock as the profit in the transaction, no loss being contemplated.

I have read and re-read the testimony in this case, as well as the very full briefs of counsel, and find it no easy task to arrive at a satisfactory conclusion. The writings between the parties are very meager and indefinite, while the oral testimony virtually amounts to the word of Mr. Roberts against the word of Mr. Delahunty. I have, therefore, attempted to view the entire situation, aided by the letters and the writings, about which there can be no dispute, together with the unquestioned conduct of the parties, in order to ascertain what the contract virtually was, or how the parties interpreted and construed the contract made, by their attitude and action under it. In the first place it will be noted that the written statement of the agreement refers to the purchase of liens, outstanding claims, etc., of the Lebanon Springs Railroad, and the sale thereof, but says nothing about operating or improving a railroad at the expense of the parties. The July 30, 1898, letter, above referred to, expresses what was in Roberts' mind in that part reading as follows:

"Then on the sale of the road we can buy it, and for the moment we will own it as three individuals. Then we can immediately form a company, issue as small amount of bonds as possible to cover purchase, necessary improvements to put it in good physical condition, and a little profit, so it will not have a heavy interest burden; and so it will be a success as a dividend payer upon the stock. In this way we could own and control the road."

This would indicate that the parties intended to buy the Lebanon Springs Railroad, form a new corporation, transfer the purchase to it, and issue bonds to cover or secure the amount expended in the purchase, and also to procure additional money by the use of these bonds to equip the road and make it a dividend payer. While it was agreed that the parties should share the expense of making the purchase, nowhere is it indicated that the parties should put up the money to rehabilitate the road, or run and operate it; but the sale of the bonds which were to be issued was intended to furnish the money for this purpose. The situation of these parties may be illustrated as follows: Suppose two men contracted to purchase a tract of land and upon sale divide the profit or loss. One of the parties puts up all the money, but,

being unable to sell the land advantageously in its present condition, determines to erect an expensive office building thereon. This he does at his own expense, but upon sale sustains a greater loss than would have been sustained if the land had been sold without the improvement. Under the contract, could this party call upon the other to share the loss occasioned by the improvements? Of course, this is not exactly the case here; but it illustrates the difference between the contract to purchase and sell and an agreement to share the expense of improvements.

From the letters of Mr. Roberts to Mr. Delahunty it clearly appears that he considered the purchase a very cheap one, and the road of much greater value than the money it would take to buy it. There is no question but that the Chatham & Lebanon Valley Railroad was a duly organized corporation, existing under the laws of the state of New York, with officers, board of directors, servants, agents, property, and business offices. As above stated, it took over all the property purchased by these gentlemen, and issued bonds, evidently as security to them, for the transfer. Mr. Roberts has testified that the division of the stock, $600,000 to himself and $300,000 to Delahunty, "was to comply as approximately as possible with our contract." It is also fair to assume, I take it, as Mr. Roberts had put into this venture over $100,000, that he also took or held the bonds as security for his money. When this railroad company was formed, and stock and bonds issued, Mr. Roberts knew, or had every reason to know, that Mr. Delahunty had no money and could raise or borrow but little. He also knew, or must be held to have known, that he could have called upon Mr. Delahunty, pursuant to the terms of their contract, to pay his share of the expenses up to that time, or his share of the purchase price of the property. In other words, when the Lebanon Springs Railroad was purchased with Roberts' money for over $100,000 and turned over to the Chatham & Lebanon Valley Railroad, Mr. Roberts under the contract could have compelled Mr. Delahunty to pay his share of this amount. As Mr. Roberts himself has stated, this was not attempted because Delahunty· had no money.

Upon what, then, did Mr. Roberts rely when thereafter he put $175,000 into the operation and improvement of the road? Certainly not upon Mr. Delahunty's financial responsibility, which he knew to be practically valueless. In the light which the situation of the parties, their correspondence, and actions throw upon this time and their dealings, it appears to me that Mr. Roberts acted as any reasonable business man would have acted under like circumstances, if I am any judge of such. He took the $250,000 in bonds of the railroad company, which virtually, under the trust mortgage, were the property of the railroad, as security or in payment for the moneys advanced by him and to be advanced. Also, considering his expressed assurance and confidence that the railroad property was of great value and far in excess of the purchase price, and in the light which the letter of July 30, 1898, throws upon the subject, it seems reasonable to conclude that, as the bonds would be full security for advances, the stock would represent profits, if any, and was divided as such. While there is no

question but what Delahunty contracted to pay his share of the expenses and bear his share of the losses, yet it seems to me as if the only reasonable and sensible conclusion to be arrived at is that when the Chatham & Lebanon Valley Railroad was formed Roberts took or held $250,000 of the bonds as security for advances made or to be made, gave Delahunty, or permitted Delahunty to take, 10 or more for his advances and expenses, and divided the stock as profit, which thereafter both Delahunty and Roberts worked together to realize.

A written contract may be modified or abrogated by the subsequent actions and dealings of the parties, or the courts may have to give it the same meanings as the parties apparently have placed upon it. So, too, when a contract does not clearly express the full intention of the parties, their acts and dealings under it may evidence the complete agreement. Likewise subsequent conditions may compel change of purpose, and when all the evidence points to such change, and to dealings of the parties in accordance with it, then the previous contract must to that extent give way. Mr. Roberts advanced money a little in excess of the amount of bonds held by him, and then sold out to Webb for the amount of these bonds, to wit, $250,000, telling Delahunty that otherwise the road would go into the hands of a receiver, as he could put up no more money. Where the evidence upon both sides of a question is so close and unsatisfactory as it is in this case, the mind naturally turns to undisputed evidence as a guiding sign; and such an indicator I find in Mr. Roberts' letter or the correspondence of 1906. When the sale to Webb took place in 1901, Roberts naturally knew that the $250,000 was all he could get out of the venture, and that he had sustained a loss. Even although a small part of this money was retained by Mr. Webb, yet reason and experience would suggest that between 1901 and 1906 Mr. Roberts would make some claim upon Mr. Delahunty if the transaction were as he maintains—would have demanded some accounting or procured some statement of their financial position. In answer to questions along this line, Mr. Roberts swears that he frequently spoke to Delahunty about the matter between these dates, but that Delahunty always requested that the final accounting and settlement between them be postponed until Webb made the final payment. Yet the following is the correspondence in 1906 between these gentlemen: On June 11, 1906, Roberts made demand by letter upon Delahunty for one-third of the loss, inclosing the accountant's statement. On June 12th Delahunty replied:

"I had nothing to do with your transactions with Mr. Webb, or consulted about them. I cannot see how there is anything to adjust between us."

In letter of July 5, 1906, Mr. Delahunty writes:

"Until the receipt of your recent letter, you never said a word to me during the six or seven years that have elapsed since that transaction [the sale to Webb] indicating that it was a matter concerning which you felt bound to consult with me or give me information."

In Mr. Roberts' lengthy reply of July 19, 1906, he refers to the contract of 1898, but makes no mention of any conversations after 1901 about loss, nor does he refer to any requests for delay in settlement. If there had been any such, it would be the first thing to be mentioned

108 N.Y.S.—40

in reply to Mr. Delahunty's letters denying responsibility. The figures here used are not exact statements of amounts, but near enough to answer the purpose of this opinion.

The transactions between Mr. Roberts and Mr. Delahunty were conducted in such an unbusinesslike way, there is so little in writing between them or any one else to indicate definitely their intentions, their accounts and expenditures were made and kept under such a lax system, and the disbursement of a great amount of money made in apparent reliance upon such an indefinite agreement, that there is in this case much to justify misunderstanding. Like many others, this case emphasizes how careful friends should be to carry on their joint affairs in businesslike fashion, and not trust to the supposed understanding of the other, or leave important matters of liability to fading or defective memory. It may be that in this transaction Mr. Roberts' version is the correct one. Courts and judges are not infallible, but are called upon to form judgments and conclusions upon evidence which is produced, without ability to look into the minds of the parties, and without claim of ability or power to determine the exact truth. The utmost that can be done is to state a conclusion toward which the evidence preponderates, or else to declare that the party having the burden of proof has failed to sustain it. For the reasons which I have here given, recognizing fully the force of the arguments which can be made in behalf of Mr. Roberts' claim, I conclude that the plaintiff has failed to prove by a fair preponderance of evidence the cause of action set forth in his complaint, and give judgment for the defendant.